Saluki v. Credit One Bank Alisa Thavari Thank you very much, Mr. Cooper. Thank you for your time. Next up is Sigmund. Am I pronouncing that right? Sigmund, like Freud, Your Honor. Oh, okay.  You may proceed. Good morning, Your Honors, and may it please the Court. Heidi Sigmund on behalf of the defendant appellee, Credit One Bank. This case comes before the Court as a Fair Credit Reporting Act dispute, but it's really a family dispute. In 2019, Ms. Saluki fought with her parents. Her mother kicked her out of the house, and within a few weeks, Ms. Saluki began alleging that her mother had stolen her identity. And as Your Honors discussed with Ms. Thavari, Ms. Saluki's mother responded to that. She affirmatively reached out to Credit One, and she said, this is not fraud. This is not forgery. We sat down together. I think we get all that. I guess the issue is it's not at all clear that the decision with respect to the investigator involved that information. So, I mean, certainly the district court concluded that there were disputed issues of fact as to whether that information was available to or known to the decision makers. Sure. Do you agree with that? I do agree, Your Honor. And I think what's really important here is that all the evidence other than Ms. Saluki's own allegations that Credit One either did review or could have reviewed supported Ms. Saluki's mother's explanation of what happened. Well, much of it seemed to be consistent with sort of both. I mean, it was purchases that were made, addresses that were used, phone numbers that were used that would be consistent with daughter understanding that mother was doing this and this being a joint operation or the daughter being in the dark on this. But I guess I'm just trying to figure out what is a credit card company supposed to do when there are two different people who say radically different things in terms of causation. So what Mr. Cooper is saying is that, well, when it's a tie like that, the tie goes to Ms. Tewari's client. And I'm not sure what his basis for that is, but I guess I'd like to hear you respond. Sure. So as I think we agree, all the FCRA requires is reasonableness. And so Credit One is entitled to draw any conclusion that the evidence reasonably supports. When you say the evidence, you mean all the evidence, not whatever. If they only decide to look at two pieces of evidence, but there's a mountain of other evidence, that wouldn't necessarily be reasonable, right? That's correct, Your Honor. And I would like to address this point that y'all were discussing about, is the policy just you look for two links and then you stop unless there's an identity theft report? That's not the policy and that's not what the testimony is in the record. I would encourage Your Honors to review the policy that everyone agrees was applicable, which can be found at Joint Appendix pages 204 to 206. And also the testimony of Mr. Perry and Ms. Maragos, our corporate representative, in their declarations, where they talked about several pieces of evidence that Credit One did actually review, in addition to those strong links on the address and the phone number. But they didn't know about the allegation that the plaintiff's mother was responsible, had engaged in fraud, right? The investigators knew that Ms. Saluki was alleging identity theft. But not that she was accusing her mother of it. Because that would, I mean, the links that they would look at, you know, the address, phone number, etc., will of course be there if the perpetrator is the mother. So it's not going to mean that much. Those links are not going to be as relevant in a situation where the identity theft identifies the culprit as a relative who shared an address with the plaintiff, right? So I think those links are still important, Your Honor, because, again, of course reasonableness is dependent on the specific facts of the allegations. And Ms. Saluki did submit a letter with her ACDV. And there's a little handwritten portion that mentions Credit One and talks about her mother. So the investigators certainly did review that letter. Where's that in the record, the letter of that? I'm afraid I don't have the page number. It's in the appendix somewhere? Yes, Your Honor. It would be with the ACDVs, I believe. Right. But the investigators who made the decision were not aware of that letter, right? They have the letter, Your Honor. They reviewed the letter before they made the decision? They did review the letter. I think there's a difference between the original affidavit of fraud, which Ms. Saluki alleges they did not review, and then there's something called a dispute letter that Mr. Perry says he looked at. That's correct, Your Honor. And so I'm trying to find that dispute letter, but it's in here somewhere. We'll find it. We can get that page for you, Your Honor. You're saying that dispute letter refers to the mother? It does, Your Honor. And so I want to go back to this. The policy required, and Mr. Perry testified that he did significantly more than just look at these two links. Mr. Perry testified that he reviewed the payment history, and it's undisputed that having consistent, timely payments on an account is highly, highly unusual in identity theft cases. And again, because they're sort of generic, and then there's, because obviously every investigation has to be tailored to the particular case. So in this particular case, when it's a mother-daughter situation, is there a distinction in your mind about the reasonableness of relying on minimum payments versus full payments, given the stated, given mother's explanation? I don't think so, Your Honor. I mean, the testimony in the record is that it's extremely unusual to have any sort of payments on an identity theft claim. And in fact, in the Wood case, on which Ms. Saluki relies very heavily, it was a similar fact pattern. The plaintiff alleged that his mother had stolen his identity. And one of the things that was important was that there were no payments ever made on that account. So I think the fact of consistent, timely payments is very important here. And I would note that the account was ultimately paid off in full. This was not she made minimum payments and then at some point she stopped making payments. The account was ultimately paid off in full. When you say ultimately, can you sort of help me understand in the timeline of this case ultimately, like after it's in litigation or ultimately before the decision was made to validate the debt? Where did that? In between, Your Honor. My recollection is that payments were being made consistently from when the account was opened in 2017. The account was closed in 2019 when Ms. Saluki first alleged that it was invalid. But payments continued to be made even after the account was closed. And I believe the card was paid off in full summer of 2020. So you're not asserting that in the context of deciding whether to validate the debt that the investigators could rely on the notion that had been paid off. That's that's sort of after the fact, general interest facts. That hadn't happened, Your Honor. But again, what Mr. Perry said he looked at and what is undisputed is very unusual for identity theft cases is that there were consistent, timely, continuing payments. But the letter, the dispute letter is not something Perry looks at. That's the fourth thing. I mean, there's sort of four investigations in this case. Right. And the last one is done by Raux, R-E-A-U-X. That's after Saluki has sent the dispute letter that you're referring to that identifies her mother as the perpetrator of a fraud. But Rio doesn't. All Rio does basically is confirm that the address and phone number are consistent with Saluki. That's incorrect, Your Honor. The testimony in the record is that Ms. Raux conducted an investigation. She followed the same procedure that Mr. Perry did. And Mr. Perry, again, he looked at the payments. He looked at the red flags or the absence thereof on the initial account application. He looked at the fact that there were no fraud alerts on the account. He looked at the fact that there was another credit one credit card open in the household. And the testimony from Ms. Miragos is that family members often refer one another to credit one. All of this is consistent with either story. It's not clear to me how those bits of evidence that Raux identified proved or disproved the story being told by Ms. Tewari's client. So all of that evidence, again, supports the mother's explanation that the account was valid. And so in light of all of that evidence. The mother's explanation that the account is valid, that didn't take place until later, right? That postdates the dispute letter. So what I'm saying is that the evidence matches the mother's explanation, which she provided before the dispute letters were ever sent. And so in that circumstance and in that narrow situation only, credit one does require an identity theft report in order to sort of place the thumb on the scale in favor of the consumer as plaintiff is alleging. And so where there's substantial evidence connecting the consumer to the account, credit one says, are you taking this seriously enough to file a law enforcement report? That is credit one's policy. The position would be, you're not going to get causation because our policy says if you don't file a report with the authorities, then given this kind of factual scenario, we're not going to decline to verify the account. That's the position that you're taking. Yes, so on this record, in light of the policy, which again, it does more than just look at two links. But on this record, where there's substantial evidence connecting the plaintiff to the account, credit one does look for an identity theft report. So do you agree just as a sort of framework matter that even in the context of the causation analysis, we have to figure out whether that would be a reasonable expectation on the part of credit one? Because if it is, then it would be tough, I think, for the plaintiff to get causation because she didn't submit an identity theft report. But if it's not a reasonable expectation, then it doesn't help us figure out what a reasonable investigation would have led to. I think the question for causation is, would a reasonable investigation have uncovered that this account reporting was inaccurate or incomplete? If you're relying on that policy to say she didn't submit a report, and we would expect her to in this scenario, and I think I'm understanding that to be part of the explanation why it's reasonable. It's reasonable because she didn't submit this report, and absent that, given the conflicting evidence that the investigators would have faced had they actually looked at all the evidence, in the absence of that, we're going to go ahead and validate. Had she done the opposite, consistent with law, we would have not verified, I guess. If that's an unreasonable expectation, though, then am I wrong that if we conclude that's not a reasonable expectation, we can't then rely on that in the causation analysis? I think it's a factor in the causation analysis, Your Honor. But again, I think it's a sort of totality of the circumstances question. Had Credit One taken these steps that Ms. Tewari says they should have taken, regardless of what its policy says, would that have changed the conclusion? And the district court correctly concluded that the answer to that is no. Because again, had Credit One looked further into the payments that had been made, they would have seen that those payments came from a bank account that Ms. Saluki shared with her mother. You and Ms. Tewari talked about the purchases earlier. Credit One could have looked more at those purchases and said, some of these purchases are really inconsistent with Ms. Saluki's mother using the credit card. In what way? Help me understand that. Sure. And I believe you discussed this with Ms. Tewari. Some of the purchases like American Eagle, Payless, Uniqlo, those purchases are demographically much more consistent with Ms. Saluki using the card than with her mother using the card. Mothers don't shop at Payless and American Eagle? It's not impossible, Your Honor. But I'm saying it's more consistent with Ms. Saluki using the card. Again, all Credit One has to do is act reasonably and draw a conclusion that is reasonable based on the evidence. Credit One does not have to imagine every hypothetical that we as lawyers can come up with. But with respect to causation, I guess, does the record indicate that absent a police report, situations like this where someone is accusing a relative of fraud, that's not going to cut it for the nominal cardholder? Is it that clear from the record that that is? No. No, Your Honor. Again, I would encourage you to look at the policy that applies here and Mr. Perry's and Ms. Maragos' testimony about all the facts that were in play here. Credit One follows that policy of looking at the account application, looking at the red flags, looking at payments and so forth and so on. It is not as simple as if there's family identity theft, we must have a police report. Credit One looks at all of that evidence that was gathered and examined in this case. All right. Thank you very much, Ms. Siglin. We'll now hear from Ms. Tewari for a few minutes of rebuttal. Thank you, Your Honor. Judge Sullivan, I think that you are exactly right that here there's Once in a while I am, but that there's information here that is consistent with both stories, the mothers and the daughters. But in a situation like that, a jury could find that a reasonable investigator would not have verified the account. But why? I mean, so why? So what evidence would the jury hear about what reasonable investigators do when someone is accusing a relative of fraud but doesn't have the conviction to call the police about this fraud or file a separate lawsuit about the fraud? So two points on that. First, the record here shows that our client tried to file a police report. She testified that she went to the police department. She sat down with detectives and they asked her- Did the bank know that? Yes, that is docu- The bank knew that she tried to file a police report? Yes, that is in the account notes at J.A. 58 through 59. The account notes say that she called in, she requested specific documents, and she wanted those documents to file a police report. So a reasonable investigator here would have had that information. They would have seen that, and- 58? Oh, sorry, that is her testimony. The account notes say it at J.A. 271. I'm sorry, Your Honors. And they- So a reasonable investigator would have had that information. But more to your point of what would have happened at trial. At trial, a jury would hear the phone recordings, and they would think, what would a reasonable investigator believe here? And because there's information on both sides, we can't say as a matter of law an investigator would have gone one way or another. I just want to clear up a few of the factual issues in the record. My friend on the other side says that Perry and Rucks looked at all this other information. But I think where we have an issue is that at summary judgment, the facts have to be taken in our favor. And the account notes here indicate something quite different. And as to the dispute letters, those are at J.A. 144 and J.A. 194. No, I found it. Okay. At least the one at 194. But the letter does say my mother did it. Yes. So what does this- And Perry says he looked at the dispute letter. So Perry knew that the plaintiff was alleging that it was her mother. So what more would the declaration have added? So the declaration would have added that there were sworn allegations that my client was willing to say under penalty of perjury that this was the case. But I'll note, Your Honor, that even though Perry had the dispute letter, he did not appear to factor it into his- By the way, the declaration also refers to purchases at JCPenney, Adidas, Guess. I don't know if those fit within her- I think those could fit with my client having the card. It also could fit with the mother having the card. But Perry didn't factor my client's allegations into his review. As Judge Sullivan said earlier, Perry concluded the account was my client's because of connections that he found to my client, not because of connections to the mother, not because the mother had permission. So really what Credit One is asking here is for them to use a post hoc rationalization that investigators would not only find the mother saying she had permission, but Credit One wants this panel to conclude as a matter of law that an investigator couldn't have come to any other outcome and a jury could not find that an investigator here would have removed the account from credit reporting. And we just think that the record in front of Your Honors is too conflicting and too all over the board for this case to be resolved at summary judgment. For those reasons, we think the panel should reverse. Thank you, Your Honors. Okay. Thank you, Ms. Tewari. Thank you all. We will reserve decision.